# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 7, 2014

## STATE OF TENNESSEE v. ARTTERRACES BUCHANAN

**Appeal from the Criminal Court for Shelby County**
**No. 1201159     Chris Craft, Judge**

---

**No. W2014-00058-CCA-R3-CD  - Filed January 22, 2015**

---

The Defendant-Appellant, Artterraces Buchanan, pleaded guilty to one count of reckless aggravated assault, a Class D felony. <u>See</u> T.C.A. § 39-13-102. The trial court denied the Defendant's request for judicial diversion and imposed a two-year sentence involving split confinement. On appeal, the Defendant contends that the trial court erred in denying his application for judicial diversion. Upon our review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

Donna Graham Lawson, Memphis, Tennessee, for the Defendant-Appellant, Artterraces Buchanan.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Marianne Bell, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This case arises from a motor vehicle accident occurring on October 10, 2011, in which both the Defendant-Appellant, Artterraces Buchanan, and Sergeant Trini Dean were seriously injured. The Defendant subsequently pleaded guilty to one count of reckless

aggravated assault, a Class D felony.[1] See T.C.A. § 39-13-102. The matter proceeded to a sentencing hearing on November 20, 2013.

At the hearing, the State entered into evidence the Defendant's presentence report, medical records, and certified copies of his juvenile court records. The State also called one witness.

Trini Dean testified that he was formerly a sergeant with the Shelby County Sheriff's Office but was currently on long-term disability status as a result of the October 2011 accident. On the day of the incident, Sergeant Dean was driving northbound on Airways Boulevard to work when the Defendant's vehicle struck him in a head-on collision. He said that he was driving at a rate of approximately thirty to thirty-five miles per hour and that the Defendant was presumably driving at a higher rate of speed because Sergeant Dean's squad vehicle "stopped immediately upon impact." The Defendant's vehicle ignited, and the fire spread to Sergeant Dean's vehicle. He said that the impact dislodged his vehicle's electrical system, therefore locking his seatbelt and jamming his doors and windows. It took several Memphis police officers and firefighters to break the door and pull him from the vehicle.

As a result of the accident, Sergeant Dean sustained fractures to both knees and his thigh bones. He had brackets placed on the outside of his knees and rods in his legs. He believed that he had fourteen screws placed in his left leg and sixteen screws in his right leg. Sergeant Dean had four broken ribs on his right side, a fracture in the back of his neck, and a broken right hand and wrist. His broken right hand affected his job because he needed that hand to use a gun. His last test reflected that he had eighty percent strength in that hand. Sergeant Dean was hospitalized for twenty-four days at Methodist University Hospital and then released for two weeks of recovery at Health South Rehabilitation Hospital. He was confined to a wheelchair for about ninety days and was able to walk about six months after the accident. Twenty years prior to the collision in this case, Sergeant Dean had to have both legs amputated below the knee after a roadside accident. After the current accident, he had to be refitted twice for new prosthetics. He also suffered financial losses because his doctors would not clear him to return to active duty. He reported that during his time away from work, his income was "cut by about sixty percent." Apart from the eighty percent strength in his right arm, Sergeant Dean was limited to standing for brief periods of time and could

_____

[1] We note that the Defendant did not include the transcript from his plea submission hearing in the record on appeal. We have carefully reviewed the appellate record and conclude that the indictment, the judgment sheet, the sentencing hearing transcript, and the presentence report are sufficient for a meaningful review of the issue on appeal. See State v. Caudle, 388 S.W.3d 273, 279 (Tenn. 2012) (concluding that "[i]f . . . the record is adequate for a meaningful review, the appellate court may review the merits of the sentencing decision with a presumption that the missing transcript would support the ruling of the trial court.").

only sit for two-hour increments. Consequently, he was placed on long-term disability and received sixty percent of his normal salary. In terms of experiencing pain, he stated that "[s]ome days [we]re better than others" and that he had a lot of stiffness and soreness on cold days.

Sergeant Dean considered himself and the Defendant to be blessed to be alive. He held no ill will against the Defendant and understood that the Defendant was eighteen at the time and that the accident was a mistake. However, he opined that "there should be some punishment involved in this matter[,]" in particular "to try to correct this behavior." To his knowledge, neither the Defendant nor the Defendant's family had contacted him to apologize or to check on him.

On cross-examination, Sergeant Dean testified that he did not notice the Defendant's vehicle until the impact. He did not believe that the collision was intentional. At the time of the accident, Sergeant Dean had been working for twenty-three years and had planned on retiring after thirty years or more. He acknowledged that he could engage in some physical activity. Sergeant Dean agreed on redirect examination that the number of years he worked affected the amount of pension that he received.

After the State's proof, the defense called two witnesses. Diane McGhee, the Defendant's mother, testified that she currently lived with the Defendant, a daughter, and two grandchildren. She said that she and other members of the Defendant's family would support him if he were released on probation or judicial diversion. She explained that the Defendant's uncle played "a big role" in his life and usually picked him up from work as a dishwasher at Applebee's. She stated that the Defendant worked five days a week from 5:00 p.m. to 2:30 a.m. and that the Defendant's uncle or one of his older sisters usually took him to work. Ms. McGhee stated that after the accident, her son had difficulty remembering things and that family members had to remind him everyday to check that he had his identification and other items for work. When the Defendant returned from work, he would "probably eat something, take a bath and go to bed." She noticed physical changes in her son, including the fact that he could no longer run or play sports. She said that he had bad vision, nerve damage in his face, and scars on his body. She was reminded of the accident every day and said that her son was "a better person now."

Ms. McGhee said that she had an eye disease and that on the day of the accident, the Defendant drove her to work at Memphis International Airport because he was the only person available to take her. She denied that the Defendant smoked marijuana, used drugs, or drank alcohol that day. She said that she would not have let him drive her truck if he had been under the influence of any substances. On the way to the airport, the Defendant drove normally and did not speed. He dropped her off and continued to drive normally away from

the airport. Ms. McGhee had no explanation for the accident. She apologized to Sergeant Dean for his injuries and for allowing her son to drive without a license. For her part in the accident, she was also charged and given a $500 fine. She said that her son did not currently smoke, drink, or use illegal substances in her home. After multiple attempts, the Defendant obtained his driver's license.

Ms. McGhee said that her son graduated from Whitehaven High School in 2011 and then he had a job packing rice in a warehouse through a temporary agency. She said that about two weeks before the accident, her son interviewed for another job and that the company called him while he was hospitalized. When she arrived at the hospital on the day of the collision, the Defendant was heavily sedated and "banged up bad." In describing her son's injuries, Ms. McGhee stated that "[h]e had a blood clot on his brain. His collar bone was broke. His femur was broke. Both his legs and they had to go in his stomach twice. . . . [b]ecause his bowel had twisted." She said that he was first taken to Methodist Hospital and was later transported to Regional Medical Center, or "the Med," to treat his second and third-degree burns. He underwent a skin graft and remained at the Med for a month. After his discharge, the Defendant was confined to a wheelchair for about three months and his mother took care of him, including bathing and feeding him. He taught himself to walk again but he had a limp.

Ms. McGhee acknowledged that the Defendant had a juvenile record and that he committed delinquent acts with friends in the neighborhood. She said that since the accident, her son no longer hung out with the same friends and that he did not have an adult criminal record. She stated that the Defendant spent most of his time either at work or at home, and he occasionally went to the movies. According to Ms. McGhee, the Defendant was older, wiser, and would stay out of trouble in the future. She said that when her son was younger, "he was just being a kid." She stated that her son almost died because of the accident and that he had to fight for his life. She believed that the his days of juvenile delinquency were over.

On cross-examination, Ms. McGhee testified that she did not own a vehicle and denied that the Defendant continued to drive occasionally. She thought that her son may have been driving a friend's car when he was arrested on January 14, 2013, for driving with a revoked license. She acknowledged that before the accident, the Defendant drove her to work without a license "every day that [she] needed to work." Ms. McGhee denied that the Defendant did what he wanted with the car after dropping her off. She said she "always called and checked and made sure that he went back home." Although she was at work, she said that her two daughters were at home. She did not observe the accident and was unaware whether the Defendant was "out of control" or "weaving in and out of traffic" as some witnesses had reported.

-4-

Ms. McGhee denied that her son was "out of control" as a child, because he was attending school. She agreed that he was getting in trouble and going to juvenile court. She recalled that at age nine, the Defendant, his brother, and other juveniles were caught vandalizing eighteen cars on a lot. The Defendant was placed on probation and released to her custody. She further conceded that at age twelve, the Defendant and his brother got in trouble for throwing bottles in front of a neighbor's house. The Defendant had also shot another neighbor with a BB gun in a separate incident. The Defendant was released to his mother's custody in both cases. Ms. McGhee did not recall that the Defendant was caught with two bags of marijuana at age fifteen on July 11, 2008. However, she did remember that her son was involved in a fight outside a local elementary school when he was sixteen during what was reportedly a gang initiation. The Defendant had fled from officers, was arrested, warned, and referred to the Operation Hope program. Ms. McGhee said that her son did not participate in Operation Hope because there was no vacancy. She denied that the Defendant was involved with the Bloods gang. At age seventeen, the Defendant and his brother drove at a high rate of speed to flee from officers responding to a prowler call. Ms. McGhee agreed that the Defendant had ignored officers' commands to stop his vehicle and was later arrested at home. A month later, in April 2010, the Defendant was involved in a school fight and got in trouble for repeatedly striking an assistant principal who had tried to intervene. Ms. McGhee acknowledged that her son was charged with theft of a shirt and socks from Walmart when he was seventeen. The Defendant was summoned to juvenile court where he was warned and released to his mother's custody. Thereafter, the Defendant turned eighteen in March 2011, and the accident occurred seven months later in October.

Upon questioning from the trial court, Ms. McGhee said that she did not have health insurance at the time of the Defendant's accident. She explained that her son's medical bills were paid for by TennCare. She conceded that the State paid for the Defendant's care because she did not have insurance. Ms. McGhee did not have an answer when the court asked why the Defendant received a citation for driving without insurance or wearing a seat belt in January 2013.

On redirect examination, Ms. McGhee agreed that the incidents listed by the State occurred when the Defendant was a juvenile and that he had not incurred any other cases since turning eighteen. She further agreed that the Defendant obtained his driver's license after his attorney advised him to do so. She said that the Defendant no longer spent time with his brother, who did not live at their house. She did not believe that her son was in any physical shape to be causing more trouble with his brother.

The twenty-year-old Defendant testified that he was eighteen at the time of the car accident. He graduated from high school with a regular diploma after taking resource classes. He said that after graduation, he worked at the rice plant for forty hours a week for

about a month and a half until "[t]he work got slow." Thereafter, he looked for another job, but the process was hampered by the accident. He found work doing lawn maintenance at a small company called APS, but he could not take the job because of the car wreck. The Defendant could not remember the car accident or losing control of his car. The only thing he recalled from that day was dropping his girlfriend off at school in the morning and sleeping at his house until his mother woke him up to take her to work. He denied smoking marijuana, using drugs, or drinking alcohol that day. Regarding the accident, the Defendant recalled being rushed into a hospital room and providing his mother's phone number to the staff.

The Defendant described his injuries and hospitalization consistently with his mother's testimony. He testified that he had broken his collar bone, jaw, femur, ankle, and feet. He had a blood clot in his brain and second and third-degree burns on his arms and back. The Defendant said that hospital staff "had to go inside [his] stomach and they knocked the nerves out of the left side of [his] face[.]" He was in severe pain and sedated with morphine at first and then received other pain medication during the entire month of his hospitalization. After his release, he could not walk or talk during his recovery. The Defendant stated that he was able to walk again after four or five months and that he began looking for work. He worked at New Breed for five months packing deliveries but was let go during peak season when additional temporary staff members were hired. He then worked for MVP packaging boxes of candles until the work slowed down. Both of these jobs had forty-hour work weeks.

After he was charged for the car accident, the Defendant had a hard time finding work because of his record. He applied for seven or eight jobs until he was hired at Applebee's as a dishwasher. He said that he had worked at Applebee's for the past six months and that he enjoyed his job. The Defendant worked at the restaurant five days a week from 5:00 p.m. until closing at 2:00 a.m. He stated that the work was hard because he had to stand all day with rods in his feet but that he "just work[ed] through pain most of the day really." He earned about five hundred dollars every two weeks, and he used the money for food and transportation and to help his mother pay the bills. He said that his family helped him get ready and remember things for work because of his condition. After work, the Defendant went directly home to sleep and no longer socialized with his friends. When he was not at his job, he usually stayed at home and helped clean and maintain the house. On his two days off, the Defendant typically spent time with his mother at home. He said that he would definitely lose his job if the trial court sentenced him to jail.

Regarding his juvenile record, the Defendant testified that he was young and "just didn't really know what life really was about[.]" He "just straightened up" when he got older and by the time he graduated, he decided to become a diesel mechanic. While the case was

pending, he considered attending Tennessee Tech but did not have transportation so he continued working to earn money and help his mother. As an adult, he no longer committed vandalism or shoplifting. He denied drinking alcohol or using illegal substances. According to the Defendant, the accident changed him and showed him that life was "more important than hanging out with friends just trying to be cool." He said that he had tried to contact Sergeant Dean multiple times to apologize. He was sorry to have put Sergeant Dean in this predicament and to have unintentionally hurt him. The Defendant acknowledged that Sergeant Dean was seriously injured and had to retire.

The Defendant said that he was charged in January 2013 for driving without a license and that the case was dismissed after he obtained a license. He agreed that he was a careful driver who did not have any traffic tickets. He said he was not currently driving because he was trying to get another car, insurance, and to avoid tickets. The Defendant requested another chance from the trial court so that he could pursue a career and avoid having a felony on his record. He said that he did not intend to have an accident or to hurt anyone. He stated that he would stay out of trouble "[f]or life."

On cross-examination, the Defendant said that he obtained his license in March 2013. He acknowledged that he had driven since age eighteen without a driver's license or car insurance. He denied that he currently drove and said that he obtained a driver's license to have his charge of driving with a revoked license dismissed. The Defendant testified that he did not know his license was suspended when he was pulled over on January 14, 2013. However, he acknowledged that he was also arrested a month before on December 19, 2012, for not having a driver's license. He denied speeding during the December 2012 incident, although the arrest ticket noted that the officer had observed the Defendant driving "at a high rate of speed in excess of forty-five miles [per] hour." Prior to the accident in question, the Defendant denied swerving in and out of traffic. He denied running a red light or cutting off another driver. He acknowledged losing control of his vehicle but denied driving recklessly. The Defendant could not recall how the accident occurred and did not know how he lost control of the car.

After the State's cross-examination, the trial court extensively questioned the Defendant about the accident and the Defendant's subsequent driving habits. The court expressed concern that the Defendant continued to drive without a license or insurance after both he and Sergeant Dean were badly injured. The Defendant was apologetic and maintained that he did not intend to break the law, though he acknowledged that driving without a license was a crime. The Defendant advised the trial court that he obtained his license, but he still did not have insurance because he did not have a vehicle. The trial court emphasized its concern that the Defendant might repeat the incident of injuring himself and others without the ability to pay medical bills. The court opined that the Defendant did not

seem to take the circumstances seriously. The Defendant promised the trial court that he would not drive until he had insurance and that he would not get into any more trouble.

Following arguments, the trial court considered the required factors and denied the Defendant's request for judicial diversion based on the circumstances of the offense, the Defendant's lack of amenability to correction, and the deterrence value to the Defendant. The trial court stated, in pertinent part:

> I don't think I would have as much of a problem if he didn't get out of the hospital and get back [in the] car and get pulled over again. To me, that's -- it just means to me that he doesn't really care. And I know he says he's sorry. But I just can't convince myself that he is actually understanding that it's a crime that he committed when he drove again after this.
>
> . . . .
>
> We've got a guy whose life basically, he lost his career. He lost forty percent of his pension. He lost his -- knowing he can go to work and do a good job. He lost all that. And he has all these bills he can't pay and I'm not kidding myself that [the Defendant] could ever pay [Sergeant Dean's] medical bills. [The Defendant] can't pay his own medical bills. All because [the Defendant] just drove and didn't care because his mom didn't care. And it's her fault just as well as his.
>
> People don't care about the law. We've got the cardiac -- and I tell this a lot. We have -- we used to have a cardiac unit at the Med, the Regional Medical Center, so if some elderly person had a heart attack, they could take them there and treat it. But there are so many people driving without insurance in Memphis, there are so many trauma victims, that they don't have enough money to keep up the cardiac unit because they have to spend it all on people without insurance. And so, about five years ago, they had to get rid of the cardiac unit. So now if people have a heart attack, they try to make it out to Baptist or somewhere, but they just die. And it's all because people get in a car without getting insurance.
>
> And so it seems like it's not very important to people, but it really is. And once you do this, and you severely injure somebody, and of course, they can sue Mr. Dean for his medical bills and if he doesn't -- he might have to take bankruptcy and lose his house if he can't pay it, he owes the medical bills. And it's all because this man just decided that he was going to drive without

insurance. And then, he gets out of the hospital and he continues to do it. And the scary thing is he has a driver's license right now. Only to get out of his criminal charges, and he has no insurance. And you can get liability insurance if you don't have a car. My daughter doesn't have a car and she's got liability insurance.

And so, what assurance do I have that he gets probation or diversion, tomorrow he's not going to kill someone's child and have no insurance? Or really maim a child terribly and that child can't get plastic surgery because the Med won't do it and he can't pay for it because he has no insurance because he just doesn't really think that it's serious and he pretty much said that on the stand. It's just a terrible, terrible situation, because this isn't an intentional crime, but it has horrible effects.

And so, looking at the diversion, under State vs. Parker, his amenability to correction. . . . I'm looking though at his record and all the -- the repeated attempts in juvenile court, and of course, that can be blamed on his brother as [defense counsel] says. But then all this goes on and then he gets back in that car and does the same thing. And so I don't really find that he's amenable to correction, just to let him go. As Mr. Dean said, it just doesn't seem like he should just be let go without any more punishment, without any punishment at all, other than what he did to himself.

The circumstances of the offense -- the circumstances themselves aren't aggravated, but the extreme damage done is.

He doesn't have a criminal record as an adult, looking at his social history. He has a fairly bad social history.

The status of his physical and mental health, that kind of inures to his benefit because he is hurt in his accident.

I have to consider deterrence value to the accused. Not to others, but to the accused because he committed this same crime right after he got out of the hospital.

As far as this felony conviction, I think that would serve the interest of the public, but as far as not punishing him with jail time, I don't think that will serve the interest of the public or the accused, under Parker.

So because of that reason, because he continued to commit this crime after -- it wasn't an aggravated assault, but after he got out. I find that he does not merit diversion.

After finding that the Defendant should be considered a favorable candidate for alternative sentencing, the trial court sentenced him as a Range I, standard offender to two years in the workhouse. The Defendant was ordered to serve sixty days of his sentence immediately, followed by three years of supervised probation. The Defendant timely appealed the trial court's sentencing decision.

## ANALYSIS

The Defendant argues that the trial court abused its discretion in denying his request for judicial diversion. The State responds that the trial court considered and weighed all the appropriate factors and properly denied diversion. Upon review, we agree with the State.

Tennessee Code Annotated section 40-35-313 outlines the requirements for judicial diversion. After a qualified defendant is either found guilty or pleads guilty, a trial court has the discretion to defer further proceedings and place that defendant on probation without entering a judgment of guilt. T.C.A. § 40-35-313(a)(1)(A). A qualified defendant is defined as a defendant who pleads guilty to or is found guilty of a misdemeanor or a Class C, D, or E felony; is not seeking diversion for a sexual offense as defined in the statute or a Class A or Class B felony; and does not have a prior conviction for a felony or a Class A misdemeanor. Id. § 40-35-313(a)(1)(B)(i). Upon the qualified defendant completing a period of probation, the trial court is required to dismiss the proceedings against him. Id. § 40-35-313(a)(2). The qualified defendant may then request that the trial court expunge the records from the criminal proceedings. Id. § 40-35-313(b).

Eligibility for judicial diversion does not entitle the defendant to judicial diversion as a matter of right. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). Rather, the statute states that a trial court "may" grant judicial diversion in appropriate cases. See T.C.A. § 40-35-313(a)(1)(A). In deciding whether a qualified defendant should be granted judicial diversion, the trial court must consider the following factors: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; (6) the deterrence value to the defendant and others; and (7) whether judicial diversion will serve the interests of the public as well as the defendant. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing Parker, 932 S.W.2d at 958; State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993) (citation omitted), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9-10 (Tenn. 2000)). The trial court may consider the

-10-

following additional factors: "'[the defendant's] attitude, behavior since arrest, prior record, home environment, current drug usage, emotional stability, past employment, general reputation, marital stability, family responsibility and attitude of law enforcement.'" State v. Washington, 866 S.W.2d 950, 951 (Tenn. 1993) (quoting State v. Markham, 755 S.W.2d 850, 852-53 (Tenn. Crim. App. 1988) (citations omitted)).  The trial court must weigh all of the factors in determining whether to grant judicial diversion.  Electroplating, Inc., 990 S.W.2d at 229 (citing Bonestel, 871 S.W.2d at 168).  Finally, "a trial court should not deny judicial diversion without explaining both the specific reasons supporting the denial and why those factors applicable to the denial of diversion outweigh other factors for consideration." State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997) (citing Bonestel, 871 S.W.2d at 168).

Prior to State v. Bise, 380 S.W.3d 682 (Tenn. 2012), the grant or denial of judicial diversion was left to the sound discretion of the trial court.  See, e.g., State v. Harris, 953 S.W.2d 701, 705 (Tenn. Crim. App. 1996); State v. Kyte, 874 S.W.2d 631, 634 (Tenn. Crim. App. 1993).  So long as the trial court adhered to the requirements above, this court would conclude that the trial court did not abuse its discretion if the record contained "'any substantial evidence to support the refusal.'" State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992) (quoting State v. Hammersley, 650 S.W.2d 352, 356(Tenn. 1983)). Following Bise, however, a split emerged among the panels of this court as to whether the Bise standard of review – abuse of discretion with a presumption of reasonableness – should replace the traditional standard of review for diversion decisions.  See State v. King, 432 S.W.3d 316, 324 (Tenn. 2014) (discussing the split among the panels of the Court of Criminal Appeals).  This split was recently resolved by the Tennessee Supreme Court's decision in King, wherein the court concluded that Bise provides the proper standard of review for judicial diversion decisions.  Id.  The King Court explained,

> [W]hen the trial court considers the Parker and Electroplating factors, specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion, the appellate court must apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision. Although the trial court is not required to recite all of the Parker and Electroplating factors in order to obtain the presumption of reasonableness, the record should reflect that the trial court considered the Parker and Electroplating factors in rendering its decision and that it identified the specific factors applicable to the case before it.  Thereafter, the trial court may proceed to solely address the relevant factors.

If, however, the trial court fails to consider and weigh the applicable common law factors, the presumption of reasonableness does not apply and the abuse of discretion standard, which merely looks for 'any substantial evidence' to support the trial court's decision, is not appropriate. . . . In those instances, appellate courts may either conduct a de novo review or, if more appropriate under the circumstances, remand the issue for reconsideration.

King, 432 S.W.3d at 328-29 (internal citations omitted) (footnote omitted).

Here, the Defendant asserts that the trial court improperly based its decision on the fact that the Defendant drove without a license or car insurance at the time of the accident and thereafter. He further contends that the trial court relied on evidence that was not admitted in the record in reaching its sentencing decision. Specifically, the Defendant points to the court's comments that there was no longer a cardiac unit at the Med "because people [in Memphis] get in a car without getting insurance." Finally, the Defendant argues that the trial court placed undue importance on the circumstances of the offense and failed to properly consider the positive factors in favor of diversion such as the Defendant's lack of an adult criminal record, his graduation from high school, his consistent employment, and his familial support.

The record reflects that trial court considered the appropriate factors, specifically identified the relevant factors, and placed on the record its reasons for denying judicial diversion. Therefore, we apply a presumption of reasonableness to the trial court's sentencing decision and must uphold the denial "so long as there is any substantial evidence to support the trial court's decision." King, 432 S.W.3d at 327.

In this case, the trial court acknowledged the Defendant's remorse and that the accident was not an intentional crime. However, the court emphasized the "horrible effects" and "extreme damage" of the accident, including the fact that both the Defendant and Sergeant Dean were seriously injured and that Sergeant Dean lost forty percent of his pension. The court found it particularly troubling that the Defendant continued to drive without a license or car insurance after the incident, which evinced a lack of concern or regard for the law. Despite the positive factors in the record, the trial court concluded that the interests of the public and the Defendant would be served with some punishment. Moreover, the trial court found that the Defendant would not be amenable to correction if he were "let go . . . without any punishment at all[.]" Accordingly, the court considered the Defendant's individual case and characteristics and determined that, despite his eligibility, he was not a proper candidate for diversion.

-12-

Our review of the record reveals that there is substantial evidence to support the trial court's decision. From age nine to seventeen, the Defendant committed at least eight juvenile offenses including vandalism, marijuana use, theft, assault, and disorderly conduct. The Defendant was consistently counseled, and these offenses were disposed of "non-judicially." Even after the accident occurred when the Defendant was eighteen, he continued to drive for two years without a driver's license or insurance. This court has previously held that "the commission of an offense in separate actions over a period of time indicates a sustained intent to violate the law on the part of the appellant[,]" therefore weighing heavily against the granting of judicial diversion. State v. Hazel Gillenwater, No. E2008-01701-CCA-R3-CD, 2009 WL 2393105, at *4 (Tenn. Crim. App. Aug. 6, 2009). Moreover, the Defendant received traffic citations in December 2012 and in January 2013 for driving at a high rate of speed and for violating the seat belt law.[2] Therefore, the Defendant's record did not demonstrate that he was amenable to correction.

While we agree with the Defendant that some of the trial court's comments were irrelevant, including its remarks on the cardiac unit at the Med, we do not believe that these statements tainted the trial court's analysis on the issue of diversion. Regarding the circumstances of the offense, the trial court found the consequences of the collision to be aggravated and noted "the extreme damage done" and the impact on both the Defendant and Sergeant Dean. See State v. Brian Carl Lev, No. E2004-01208-CCA-R3-CD, 2005 WL 1703186, at *3 (Tenn. Crim. App. Mar. 22, 2005) ("The denial of judicial diversion may be based solely on the nature and circumstances of the offense, so long as all the other relevant factors have been considered, and this factor outweighs others that might favorably reflect on the [defendant]'s eligibility.") (citing State v. Curry, 988 S.W.2d 153, 158 (Tenn. 1999)).

In sum, there is ample evidence in the record to support the trial court's denial of diversion, and as such, we may not revisit the issue. See Electroplating, 990 S.W.2d at 229. Accordingly, we conclude that the trial court properly exercised its discretion in denying judicial diversion, and the Defendant is not entitled to relief.

## CONCLUSION

Upon review, we affirm the judgment of the Shelby County Criminal Court.

_____
CAMILLE R. McMULLEN, JUDGE

---

[2] Although not addressed at the sentencing hearing, the Defendant's medical records reflect that he sustained severe injuries after being thrown from his vehicle.

-13-